# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARLON CURRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 2052 |
| v. | ) | |
| | ) | |
| RANDY PFISTER, ET AL., | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marlon Curry, an inmate in the custody of the Illinois Department of Corrections at Stateville Correctional Center, alleges through counsel that Stateville staff and Wexford Health Sources, Inc. medical service providers were deliberately indifferent to his serious medical needs, including: his overactive bladder condition; hand, elbow and shoulder injuries; and ear infection resulting from the removal of a cockroach. R. 40. Currently before the Court is Stateville staff Randy Pfister, John Baldwin and Christopher Medin's (the "IDOC Defendants") motion to dismiss Curry's second amended complaint ("SAC") based on res judicata and a settlement agreement Curry signed in a previous lawsuit, and alternatively for failure to allege their personal involvement as required under 42 U.S.C. § 1983. R. 80. For the reasons explained below, the Court grants the IDOC Defendants' motion in its entirety.

## Standard

While Rule 12(b)(6) is the proper vehicle for the IDOC Defendants' personal involvement argument, both res judicata and waiver due to a release are affirmative

defenses, and thus ordinarily should be raised in an answer and then in a motion for judgment on the pleadings under Rule 12(c). *See Carr v. Tillery*, 591 F.3d 909, 913 (7th Cir. 2010) (res judicata); *United States v. Rogers Cartage Co.*, 794 F.3d 854, 860 (7th Cir. 2016) (release). But the IDOC Defendants' "error" is "of little consequence because the same legal standard applies under Rule 12(c) and Rule 12(b)(6)." *Pacult v. Walgreen Co.*, 2011 WL 13209584, at *2 (W.D. Wis. June 14, 2011) (citing *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)); *accord Carr*, 591 F.3d at 913. Therefore, the Court will treat the IDOC Defendants' motion as a Rule 12(c) motion for judgment on the pleadings. *See Pacult*, 2011 WL 13209584, at *2 ("[R]ather than require [defendant] to resubmit its motion, I will treat its Rule 12(b)(6) motion on res judicata grounds as a Rule 12(c) motion.").

The standard for analyzing motions to dismiss under Rule 12(b)(6) and Rule 12(c) is identical. *See Buchanan-Moore*, 570 F.3d at 827 ("We review Rule 12(c) motions by employing the same standard that applies when reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6)."). A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required,

2

"labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

**Background**

***Medical Conditions, Treatment and Grievances.*** Marlon Curry has been a Stateville inmate since 2010. He was diagnosed with an overactive bladder prior to his incarceration, and requires medication to regulate its function. R. 40 ¶ 14. Without his medication, Curry suffers potentially debilitating bladder and testicular pain. *Id.* ¶ 16. According to Curry, the IDOC Defendants have been aware of his condition since his initial incarceration. *Id.* ¶ 15. But Curry did not receive his medication for the three-and-a-half-month period beginning April 28, 2016 and ending August 15, 2016, despite requesting it several times. *Id.* ¶ 17.

Curry first requested his medication from "Nurse Tina" on June 7, 2016, when he also informed her that his bladder was swollen, and that he had pain with

3

urination. *Id.* ¶ 18. On June 12, 2016, Curry again informed Nurse Tina that he needed his medication, but he still did not receive it. *Id.* ¶ 19.

On June 21, 2016, Curry saw "Nurse Lydia" during sick call due to pain and pressure in his left ear. Nurse Lydia examined Curry's ear and sent him to the health care unit. Medical personnel flushed a cockroach from Curry's ear and prescribed antibiotic drops to address a small cut inside his ear. *Id.* ¶¶ 48-49.

Later that day, Curry sent a letter to Kevin Halloran, Wexford's Regional Medical Director, asking for his bladder medication.[1] *Id.* ¶ 31; R. 40-1, Ex. B. He also filed a grievance regarding the cockroach in his ear, describing its removal, explaining that he had been prescribed antibiotic drops, and demanding that administration "fix this place" and "[g]et this jail in compliance," "roaches in my ear is inhumane and unsanitary" ("Cockroach Grievance"). R. 40-3, Ex. K.

At a June 29, 2016 appointment for an unrelated issue, Curry asked "Nurse Page" to follow up on his bladder medication and examine his left ear for infection. Nurse Page instructed Curry to sign up for sick call. R. 40 ¶¶ 20-21, 54. Curry still did not receive his medication.

On July 12, 2016, Curry was placed in handcuffs from approximately 11:45 a.m. until approximately 3:35 p.m. due to an institutional shakedown. He told the

---

[1] Curry attached the letters and grievances discussed here to the SAC. Thus, the Court may consider their contents on this motion. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) ("[W]e have taken a broader view of documents that may be considered on a motion to dismiss, noting that a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice.").

4

officers present—including Sergeant Medin—that he would need to use the restroom at some point because he had run out of his bladder medication two weeks prior and was experiencing pain. Medin told Curry that the search would not take long, and refused Curry's subsequent request to use the restroom. The other officers also refused Curry's restroom requests. *Id.* ¶¶ 22, 23, 35. At or around 2:00 p.m., Curry urinated on himself in front of the other inmates to relieve his pain. *Id.* ¶ 23. Later, when Curry's handcuffs were removed, he "felt immediate numbness" in his right hand, wrists, elbow and shoulder. *Id.* ¶ 35. Curry told Nurse Tina that he believed he had damaged nerves. *Id.*¶ 36.

Curry filed a grievance later that day, complaining about (among other things) the officers' (including Sergeant Medin's) refusal to loosen his handcuffs, and that he had been forced to urinate on himself despite informing the officers of his bladder condition and need for medication ("Shakedown Grievance"). R. 40 ¶ 32; R. 40-1, Ex. D.

Curry next sent a letter to Warden Pfister dated July 17, 2016, stating:

> Hello Sir, I need to explain to you what I've said in the grievance.[2] I have a bladder problem and I'm in constant pain. When you came to the cell house I told you then and you suggested I go to sick call, I did that I've also been seen by Dr. Martija the doctors assistant and still I don't have my meds, I take Flow Max would you please just tell the H.C.U. to forward my blister pack of Flow Max. <u>Thanks in advance</u>

R. 40-1, Ex. C.

---

[2] Although the SAC states that the grievance referenced was filed on June 21, 2016, the grievance bearing that date concerned the cockroach problem at Stateville. Accordingly, the Court assumes the grievance referenced in the letter is Curry's July 12, 2016 Shakedown Grievance, R. 40-1, Ex. C.

5

Then, on July 20, 2016, Curry saw Dr. Martija during sick call. He again asked for his bladder medication and reported bladder and testicular pain. R. 40 ¶¶ 24-25. But he still did not receive it. *Id.* ¶¶ 25-26. The next day, Curry asked "Nurse Windy" about his medication. She took down his information, but still no medication was provided.

Curry presented for x-rays of his hand, wrist, elbow and shoulder on July 22, 2016. *Id.* ¶ 37. Then, on July 30, Curry filed a third grievance, again describing the institutional shakedown, how he had been forced to urinate on himself, and that he still had not received his medication even after involving the medical director ("Medication Grievance"). The Medication Grievance specifically identified Sergeant Medin as having refused his restroom request, and stated that his "bladder unchecked causes pain in [his] stomach and the pain in [his] testicles." He also complained that medical personnel had refused to examine his ear for infection. R. 40-1, Ex. A.[3] The grievance did not mention Curry's alleged handcuff injuries. But Curry was prescribed muscle relaxers and naproxen for his lingering pain on August 8. A few days later, Dr. Aguinaldo, Jr. reviewed his x-rays and, finding no breaks or

---

[3] None of these grievances were resolved to Curry's liking. The Cockroach Grievance was denied as appropriately addressed via medical care and with the instruction that Curry "contain all food items to remove food sources for roaches." R. 40-3, Ex. L. The Shakedown Grievance was denied as to Curry's allegations regarding bathroom use and too-tight handcuffs. R. 40-2, Ex. G; R. 40-2, Ex. H. As to the Medication Grievance, the IDOC could not determine why Curry had not received his medication, noting on October 27, 2016 that "[h]e was seen several times by several different providers but no mention of needing the medication at those times per the notes," and stating Curry "should follow the proper sick call procedures" if he "has any more issues." R. 40-1, Ex. E.

6

fractures, placed Curry in therapy. He also prescribed additional muscle relaxers and naproxen. Curry again asked for his bladder medication, reporting that he had been in "constant pain since May." R. 40 ¶ 38. Curry ultimately received his bladder medication three days later on August 15, 2016. *Id.* ¶¶ 27-28.

In January 2017, Curry was examined by a nurse for continued pain in his right upper extremities. He also presented to Dr. Obaisi in February 2017 for the same issue. *Id.* ¶¶ 40-42. Curry claims that he continues to receive substandard care for "ongoing injuries" to his bladder, left ear, and right hand, wrist and elbow. *Id.* ¶¶ 60-61. But he has not alleged that he has gone without his bladder medication since August 2016, or that he had or requested any other appointments or made any other complaints since July 2016 regarding his ear, and February 2017 regarding his right upper extremities.

***Lawsuits.*** Curry has filed three lawsuits pursuant to 42 U.S.C. § 1983 while incarcerated. He filed the first in 2014, and both the second (this case) and third in 2017. This Court dismissed Curry's third lawsuit as duplicative of this case. *See* 17 C 2559, R. 5 (dismissing case as "duplicative" "in that it raises claims that arise from the same transaction or occurrence").

1. **2014 Lawsuit.**

Curry sued the IDOC and various IDOC employees in November 2014 alleging unconstitutional conditions of confinement and deliberate indifference to his resultant serious medical needs ("2014 lawsuit"). *See generally* 14 C 9565, R. 1. The crux of Curry's complaint was that the defendants' deliberate indifference to the

living conditions at Stateville—including contaminated water, black mold, poor ventilation, inadequate cleaning supplies, and bird, mice, spider, roach and other insect infestation (among other things)—caused his health to gradually deteriorate, resulting in asthma symptoms, allergic reactions, "kidney problems" and "other organ effects [sic]." *See* 14 C 9565, R. 26. Both Curry's original and amended complaints in that action referenced his bladder condition and problems with his medication. *See* 14 C 9565, R. 1 ¶ 33 ("Plaintiff had to ask for permission each time he . . . had to use the restroom and when the officer doesn't feel like letting plaintiff out he must hold it, I have a bladdar [sic] problem which I take medication for without a restroom I'll go wherever I am"); 14 C 9565, R. 26 ¶¶ 37-40 (alleging "Plaintiff has bladdar [sic] control issues. He urine [sic] more than normal, Plaintiff has pain in both left and right flank" and "has swelling in his left testical [sic]" "but the med tech . . . only told Plaintiff no [sic] to take pain meds but would not say why.").

Curry's complaints also attached copies of grievances he filed in 2014 and 2015, each of which specifically referred to the cockroach problem at Stateville. *See* 14 C 9565, R. 1 at 14-15 (2014 grievances, complaining about "battling the elements of 'F' House," including the cockroaches); *see also* 14 C 9565, R. 26 at 37-38 (2015 grievance, complaining that "roaches are all over the cell houses").

The parties ultimately settled the 2014 lawsuit pursuant to an agreement dated November 20, 2017 ("Settlement Agreement"). Curry was represented by counsel at that time, and the court dismissed the case with prejudice the next day. 14

8

C 9565, R. 81; 14 C 9565, R. 100. The Settlement Agreement included the following release of claims:

> The Plaintiff, his heirs, successors and assigns, agrees to release, and hereby releases and forever discharges the Defendants in their individual and official capacities, the IDOC, the State of Illinois, their agents, *former and present employees*, successors, heirs and assigns and *all other persons* (hereinafter collectively referred to as "Releasees") from all actions, claims, demands, setoffs, suits, causes of action, controversies, disputes, equitable relief, compensatory and punitive damages, costs and expenses *which arose or could have arisen* from the *facts alleged or claims made in the Action*, which the Plaintiff owns, has or may have against the Releasees, *whether known or unknown,* from the *beginning of time until the effective date of this Agreement*, including but not limited to, those at law, in tort (including actions under 42 U.S.C. Section 1983) or in equity.[4]

R. 80, Ex. C ¶ 4 (emphasis added).

### 2. This Case

Curry filed the above-captioned lawsuit pro se in March 2017, eight months before signing the November 2017 Settlement Agreement. The Court granted Curry's request for the appointment of counsel. R. 4; R. 5. Curry's counsel entered an appearance and filed an amended complaint in July 2017, and the SAC in October 2017. R. 15; R. 40. Curry named IDOC employees Randy Pfister (Stateville's Warden), John Baldwin (Acting Director of the Department of Corrections), and Christopher Medin (a sergeant at Stateville), and Wexford employees Dr. S. Obaisi (Stateville's Medical Director) and Deanna Page (a nurse), as defendants.[5] None of these

---

[4] The Settlement Agreement defined "Action" as the 2014 lawsuit. *Id.* at 1.

[5] Curry missed the deadline to substitute a party for Dr. S. Obaisi, who is now deceased. R. 52. Curry was represented by counsel at the time. Accordingly, Deanna Paige is the only Wexford defendant in the case.

9

defendants were also named in the 2014 lawsuit. The SAC contains two counts. Count I is against each defendant in his or her official capacity, and Count II is against each defendant in his or her individual capacity. R. 40 ¶¶ 59-71. Both counts allege that defendants were deliberately indifferent to Curry's serious medical needs in violation of his Eighth and Fourteenth Amendment rights by: 1) failing to provide him with medication for his overactive bladder for a three-and-a-half-month period in 2016; 2) failing to properly treat the injuries he suffered from being handcuffed during the July 2016 lockdown; and 3) failing to properly treat the ear infection he suffered as a result of the June 2016 cockroach removal. R. 40.

## Analysis

The IDOC Defendants moved to dismiss Curry's claims against them, arguing that they are barred by the doctrine of res judicata, and that Curry failed to plausibly plead that any of them were personally involved with the actions about which he complains. R. 80; R. 86. Because the Court concludes that the Settlement Agreement bars certain of Curry's claims (without the need to reach the IDOC Defendants' res judicata argument), the Court addresses that issue first, before turning to the parties' arguments on the sufficiency of Curry's personal involvement allegations, and then to Curry's official capacity claims.

### I. Consideration of Extrinsic Evidence

As a preliminary matter, the Court must decide whether it can consider the Settlement Agreement, complaint and dismissal order in the 2014 lawsuit—all of which are attached to the motion to dismiss—at this stage. Federal Rule of Civil

10

Procedure 12(d) generally requires a court to treat a Rule 12 motion that relies on material outside of the pleadings as a motion for summary judgment, or to exclude the documents attached to the motion and continue under Rule 12. *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730 (7th Cir. 2002) (citing *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)). An exception exists when the extrinsic evidence attached to the motion is "referred to in the plaintiff's complaint and . . . central to his claim." *188 LLC*, 300 F.3d at 735.

But a court also may consider documents of which it may take judicial notice. The Court can take judicial notice of the complaint and dismissal order in the 2014 lawsuit. *See Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) ("Taking judicial notice of matters of public record need not convert a motion to dismiss into a motion for summary judgment."). The courts that have taken judicial notice of settlement agreements and releases in this Circuit have generally done so only when those agreements or releases had already been filed with the court or were filed in a related case, neither of which occurred here. *See Hepp v. Ultra Green Energy Servs., LLC*, 2014 WL 7190860, at *4 (N.D. Ill. Dec. 17, 2014) (collecting cases). However, at least one court in this Circuit took judicial notice of a release that had not been previously filed. There, the defendant had asserted the release as an affirmative defense, the parties did not dispute its authenticity, and the defendant moved for judgment on the pleadings based on the release. *See Boeckman v. A.G. Edwards, Inc.*, 461 F. Supp. 2d 801, 807-08 n.6 (S.D. Ill. 2006); *see also Prestone Prods. Corp. v. South/Win, Ltd.*,

11

2013 WL 5164024, at *2 n.1 (N.D. Ill. Sep. 13, 2013 (overruled on other grounds) ("even if the Settlement Agreement had not been attached [to the complaint], the Court may . . . take judicial notice of the Settlement Agreement and its contents . . . without converting the motion into one for summary judgment" where the "parties do not dispute the authenticity of the release agreement, the text of the agreement or that the parties executed the agreement").

Here, as in *Boeckman*, Curry has not objected to consideration of the Settlement Agreement, there is no dispute about its authenticity, and no other outside evidence is necessary to the resolution of the motion. Accordingly, the Court will consider the Settlement Agreement in deciding the IDOC Defendants' motion. *See Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) (no reversible error in dismissing complaint under Rule 12 based on settlement agreement where the language was undisputed, the plaintiff did not identify evidence that would have any bearing on the motion, and the agreement was unambiguous); *see also Hepp*, 2014 WL 7190860, at *4 ("there is authority within the Circuit which could support taking judicial notice of the agreements" for purposes of the pending Rule 12(c) motion).

## II. Settlement Agreement

Illinois law governs the construction of the Settlement Agreement. *Heard v. Tilden*, 809 F.3d 974, 979 (7th Cir. 2016). The Illinois Supreme Court has "consistently h[eld] that when a contract is unambiguous on its face, the intent of the parties must be construed without consideration of parol evidence." *Cannon v. Burge*, 752 F.3d 1079, 1091 (7th Cir. 2014). Further, "[w]hen a release that includes broad

language also refers specifically to particular claims, Illinois courts limit the scope of the release to the claims arising from those specific references." *Heard*, 809 F.3d at 979 (collecting cases).

Curry has not argued that the release is ambiguous, and the Court finds that it is not. By its terms, the release applies to claims against the IDOC Defendants. *See* R. 80, Ex. C ¶ 4 (defining "Releasees" as "the Defendants [in the 2014 lawsuit] in their individual and official capacities, the IDOC, the State of Illinois, their agents, *former and present employees*, successors, heirs and assigns *and all other persons*") (emphasis added). But the release's language limits its scope to "actions" or "claims" . . . which *arose or could have arisen* from the *facts alleged or claims made* in the Action . . . from the beginning of time until the [November 20, 2017] effective date of this Agreement." R. 80, Ex. C ¶ 4 (emphasis added). The Court next analyzes whether that language bars Curry's deliberate indifference claims.

***Bladder medication.*** Curry alleges that the IDOC Defendants were deliberately indifferent to his need for bladder medication. Curry raised his bladder and bladder medication issues in pleadings in the 2014 lawsuit. *See, e.g.*, 14 C 9565, R. 1 ¶ 33 (alleging that Curry had "a bladdar [sic] problem which I take medication for without a restroom I'll go wherever I am . . ."), *and* 14 C 9565, R. 26 ¶¶ 37-40 (alleging "Plaintiff has pain in both left and right flank" and "swelling in his left testical [sic]" "but the med tech . . . only told Plaintiff no [sic] to take pain meds but would not say why."). The SAC alleges that Curry was without his medication for a three-and-a-half-month period, but that he had his bladder medication as of August

13

2016—8 months before the Settlement Agreement took effect.⁶ R. 40 ¶¶ 27-28. Accordingly, Curry's deliberate indifference claims relating to his bladder medication arose from "facts alleged" in the 2014 lawsuit and before the Settlement Agreement was signed, and are barred.

***Cockroach removal.*** Curry alleges that the IDOC Defendants were deliberately indifferent to the ear injuries he suffered due to the removal of a cockroach. Curry also described the prevalence of cockroaches in his 2014 lawsuit pleadings. *See, e.g.*, 14 C 9565, R. 1 ¶ 22 (describing conditions at F House including "[b]roken shower heads, flooding, *roaches*, ants, spiders, mice, gnats and birds") (emphasis added); *see also id.* at 14-15 (2014 grievances complaining about "battling the elements of 'F' House," including the cockroaches, and alleging that the roaches devour his food if not consumed right away); 14 C 9565, R. 26 at 37-38 (2015 grievance complaining that "roaches are all over the cell houses"). The events giving rise to Curry's cockroach claim began well before the Settlement Agreement became effective. *See* R. 40 (reflecting complaints in June 2016 regarding the ear infection at issue). But Curry alleges that he continues to receive substandard care for his ear condition, which causes "loss of hearing from time to time." *Id.* ¶¶ 55, 61. Because deliberate indifference to a serious medical need is a continuing violation that "ends only when treatment is provided or the inmate is released," Curry's cockroach removal claim survives the Settlement Agreement. *See Jervis v. Mitcheff*, 258 Fed.

---

⁶ Indeed, while the SAC alleges in conclusory fashion that he continues to receive "substandard care" for his bladder condition, the SAC is silent as to what care he requires but did not receive.

14

Appx. 3, 5-6 (7th Cir. 2007) (citing *Heard v. Sheahan*, 253 F.3d 316, 318-19 (7th Cir. 2001)).

***Handcuff injury.*** Curry's claims regarding the IDOC Defendants' deliberate indifference to his handcuff injuries were not a subject of the 2014 lawsuit, and nor did the "facts alleged or claims made" in that lawsuit give rise to such claims. Accordingly, the release does not bar Curry's handcuff injury claim.

In sum, only Curry's claims regarding the IDOC Defendants' deliberate indifference to his ear and handcuff injuries survive the Settlement Agreement.

### III. Count II: Personal Involvement in Individual Capacity Claims

The IDOC Defendants argue that Curry fails to sufficiently allege their personal involvement in support of Count II of the SAC. Individual-capacity liability under Section 1983 requires a defendant's personal involvement in the alleged constitutional violation. *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). The fact that a prison official gained knowledge of an inmate's medical condition through grievance communications generally is insufficient to plausibly allege that the prison official was deliberately indifferent to the inmate's condition. Indeed, prison officials "will generally be justified in believing that the prisoner is in capable hands," and in "rely[ing] on the expertise of medical personnel." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011).

But "[n]on-medical defendants cannot simply ignore an inmate's plight." *Id.* (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A plaintiff plausibly alleges a prison official's deliberate indifference if he "demonstrate[s] that the

communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Id.* "Once an official is alerted of such a risk, the 'refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.'" *Id.* (quoting *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)).

***Randy Pfister and Christopher Medin.*** The IDOC Defendants characterize the SAC as merely alleging that they had "notice" of Curry's complaints about his medical care, "not that they were personally involved with providing or withholding medical care." R. 80 at 5; *see also* R. 40 ¶¶ 58-60 (alleging that each IDOC Defendant had "been on notice of Curry's serious medical conditions and needs" related to his overactive bladder since 2010, and related to his left ear infection and injuries to his right hand, elbow, and shoulder since 2016). In response, Curry argues in conclusory fashion that Pfister and Medin's direct participation is not required so long as they acted or failed to act "with a deliberate disregard of plaintiff's constitutional rights," or "the conduct causing the constitutional deprivation occur[ed] at [their] direction or with [their] knowledge and consent." R. 85 at 6 (quoting *Crowder*, 687 F.2d at 1005). But the SAC says nothing about either Pfister's or Medin's knowledge of or involvement in the care of Curry's handcuff injuries or issues he suffered due to the cockroach removal.[7] And nor does Curry meaningfully argue the point in his brief.

---

[7] Curry does allege that he told Medin and the other officers present at the shakedown that his handcuffs were "too tight," but the Court cannot conclude from this that Medin was personally involved with any subsequent failure to treat his injuries, of which Curry does not claim Medin in particular was aware. R. 40 ¶ 32.

16

Accordingly, and because the Settlement Agreement bars Curry's bladder medication claims,[8] Count II fails as to Pfister and Medin.

***John Baldwin.*** The IDOC Defendants also argue that the SAC fails as to Baldwin. The Court agrees, and in failing to respond to the IDOC Defendants' arguments, Curry all but concedes the point; there has been no allegation that Baldwin was "personally involved in the alleged constitutional deprivation" of rights about which Curry complains. *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014). Indeed, the allegations that Baldwin (like the other defendants) has been "on notice" of Curry's overactive bladder "[s]ince as early as 2010" and of his left ear infection and right hand, elbow and shoulder injuries "since 2016," do not suffice; neither the IDOC Defendants nor the Court can discern from this how Baldwin can be said to have been on notice, and, more to the point, involved. *See* R. 40 ¶¶ 59, 63. The IDOC Defendants' motion is granted as to Baldwin on Count II.

---

[8] If it were not barred, Curry's bladder medication claim would go forward as to Pfister and Medin. Curry attached a July 17, 2016 letter to Pfister to the SAC purporting to follow up on an earlier grievance informing Pfister of his bladder condition and pain. R. 40 ¶ 33; R. 40-1, Ex. C. And Curry alleges, and the letter reflects, that he "explained the issue to Pfister previously . . . at which time Pfister advised Curry to go to sick call." *Id.* This, coupled with the fact that Curry did not receive his medication until a month later, is enough to plausibly allege Pfister's personal involvement in the care (or lack thereof) of Curry's bladder condition.

And Curry also alleges that he informed Medin that he required his medication (and why) during the July 2016 institutional shakedown, but that Medin "intentionally disregarded Curry's condition," "turned a blind eye" to Curry's serious medical needs, and "allowed Curry to urinate himself." R. 40 ¶¶ 22, 30. Accordingly, Curry plausibly alleged Medin's personal involvement.

## IV. Count I: Official Capacity Claims

Count I of the SAC names each of the IDOC Defendants in his official capacity. Although the parties do not address the issue, "[i]t is well-established that suits against government officials in their official capacity are suits against the governmental entity of which the officer is an agent." *Ames v. Randle*, 933 F. Supp. 2d 1028, 1038 (N.D. Ill. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). A Section 1983 suit against a State official in his or her official capacity is an action against the State itself. But such a suit is generally prohibited.[9] *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity."); *see also Srivastava v. Newman*, 12 Fed. Appx. 369, 371 (7th Cir. 2001) ("The Eleventh Amendment bars suits brought under § 1983 against state officials acting in their official capacities."); *Kentucky*, 473 U.S. at 167 n.14; *accord Garcia v. City of Chicago*, 24 F.3d 966, 969 (7th Cir. 1994). Count I is dismissed as to the IDOC Defendants.

---

[9] Official capacity suits are permitted against the State or its officials only to the extent they seek injunctive relief (which Curry does not). *Will*, 491 U.S. at 71 n.10 ("official capacity actions for prospective relief are not treated as actions against the State").

**Conclusion**

For these reasons, the Court grants the IDOC Defendants' motion to dismiss in its entirety. R. 80.

ENTERED:

*Thomas M Durkin*

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: August 12, 2019